MARK C. COGAN, OSB 92016
1500 SW FIRST AVENUE, SUITE 780
PORTLAND, OR   97201
503-827-8092
email: mark@coganlawoffice.com
ATTORNEY FOR DEFENDANT

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 3:11-CR-00467-MO |
| Plaintiff, | ) | |
| | ) | DEFENDANT'S SENTENCING |
| vs. | ) | MEMORANDUM |
| | ) | |
| JOSE RAMON GARCIA-ZAMBRANO, | ) | |
| Defendant. | ) | |

This matter is pending for imposition of sentence on February 27, 2013.  The purpose of this pleading is to summarize the reasons we intend to present in favor of imposing a sentence below the level which is being sought by the government and the Probation Department.

A.    INTRODUCTION

Mr. Garcia-Zambrano has pleaded guilty to one count of Conspiracy to Distribute Methamphetamine and Use Communication Devices.  He remains in custody on this matter, and awaits imposition of sentence.

B.    ADVISORY SENTENCING GUIDELINES BASE CALCULATIONS

We do not dispute the benchmark advisory Sentencing Guidelines calculations which are reflected in the Pre-Sentence Report.  Indeed, the advisory Sentencing Guidelines do reference a Base  Offense Level of 38 (see §2D1.1(a)(5)(c)(1) of the Federal Sentencing Guidelines).  Further, there is no dispute that a 3-level decrease applies for acceptance of responsibility (see §3E1.1(a) of the Federal Sentencing Guidelines). The parties agree that there is a 2-level decrease for resolution of a complex case. See 18 U.S.C. § 3553(a). The parties also agree that there is a 2-level decrease

**DEFENDANT'S SENTENCING MEMORANDUM**                                    **PAGE 1**

for application of the "safety valve," in which Defendant provided the government with information regarding his involvement in the drug-trafficking organization. See §2D1.1(b)(11), §5C1.2 of the Federal Sentencing Guidelines; 18 U.S.C. § 3553(f). Thus, the advisory guideline range is level 31, which prescribes an advisory sentence of 108 to 135 months.

C.    RECOMMENDED SENTENCE

The Probation Department and the government are seeking imposition of a sentence within the range of 108 to 135 months, with 108 months as the recommended sentence, as a result of the advisory Sentencing Guideline which applies in this case. The plea agreement, and the law, do not require the Court to impose such a severe sentence. The defense urges the Court to impose a lesser sentence, based on the following considerations.

D.    SENTENCING CONSIDERATIONS

Before going into the specific reasons calling for imposition of a sentence below the advisory Sentencing Guidelines range, it is important to make some general observations. The advisory Sentencing Guidelines are *ab initio* the product not solely of careful analysis and consideration of empirical data, but they are also the consequence of political guessing. The crude methodology used to create the sentencing guidelines was one of simple arithmetic averaging and addition; the Sentencing Commission simply took the average national sentences for a given offense, and then increased the incarceration term, without explanation, much less scientific studies. See U.S. v. Jaber, 362 F.Supp.2d 365 (D. Mass. 2005).

This methodology is painfully deficient as an intellectual exercise, and has the effect of compressing the varied actions of individuals and their attendant circumstances. In other words, the effect of averaging raises the floor for those whose criminality is relatively minimal and reduces the ceiling for those whose criminality is relatively greater. Combine this averaging with the wide

**DEFENDANT'S SENTENCING MEMORANDUM**                    **PAGE 2**

variance associated with certain types of offenses, e.g. quantity defined drug offenses, and you have a further disassociation of considerations of the offender and the punishment imposed.

Mr. Garcia-Zambrano is 21 years of age.  Under the lower-end Guideline Sentence, which the Probation Department is recommending, Mr. Garcia-Zambrano will be approximately 30 years old when released.  Most male inmates do not leave prison transformed into law-abiding citizens, but rather, the very skills an inmate develops to survive inside prison make him anti-social when released.  An unintended consequence of incarceration to be sure, but not easily ignored.

Perhaps, given the unscientific nature of the formulation of the Sentencing Guidelines, the physician's credo *primum non nocere* ("Above all, do no harm"), may offer some perspective. This simple phrase  reminds the physician that s/he must consider the possible harm that any intervention might do.  It is invoked when debating the use of an intervention that carries an obvious risk of harm but a less certain chance of benefit.  Historically, this phrase has been for physicians a hallowed expression of hope, intention, humility, and recognition that human acts with good intentions may have unwanted consequences.

E.    GROUNDS FOR ADDITIONAL DOWNWARD ADJUSTMENT OF SENTENCE

Pursuant to 18 U.S.C. § 3553(a), the Court is required to "impose a sentence sufficient, but not greater than necessary," to advance the sentencing policies and objectives which are provided by law.  The sentencing criteria include the need to reflect the seriousness of the offense, to promote respect for the law, to provide for just punishment, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

**DEFENDANT'S SENTENCING MEMORANDUM**                        **PAGE 3**

The plea agreement authorizes Mr. Garcia-Zambrano to request additional downward adjustments of his sentence, beyond those to which the government has stipulated and the Probation Department has recommended. We urge the Court to adjust the sentence downward based on a combination of factors, including the sentencing policies which are established in 18 U.S.C. § 3553(a).

## 1. Mr. Garcia-Zambrano's Disadvantaged Background

"Where a defendant's crime is attributable to a disadvantaged background or emotional or mental problems the defendant is less culpable than one without the excuse." Landrigan v. Schriro, 441 F.3d 638, 648 (9th Cir. 2006).

Mr. Garcia-Zambrano is from the small city of San Jose Nuevo, in the district of Apatzingan, State of Michoacán, Mexico. He grew up in very impoverished conditions. The family home was made of cardboard and had a dirt floor, which the family slept on, and when it rained, the roof did not keep the family from getting wet. Mr. Garcia-Zambrano had only a few sets of clothing, and new clothes were a rarity. When Mr. Garcia-Zambrano would go to school, he had to contend with the river that ran through his town, and when the water ran too high, he could not go to school. His father did work in the town for a time, but then left to go work in a factory some three hours away from home. Mr. Garcia-Zambrano relates that he did attend school for much of his upbringing, although when he first came to the United States to enroll in school, he was an 18 year old having to take classes that a sophomore in high school would take.

Not only did Mr. Garcia-Zambrano grow up in a poor region in Mexico, but he also grew up in a culture of drug trafficking and violence. There is no shortage of news reports from CNN, the Los Angeles Times, and others, that have documented the pervasive culture of drugs and violence in

**DEFENDANT'S SENTENCING MEMORANDUM**                              **PAGE 4**

Apatzingan, Michoacán. To say that murder is an everyday occurrence in Apatzingan, for residents and visitors alike, is a gross understatement. In fact, when Defense Counsel entertained the idea of sending investigators to Mr. Garcia-Zambrano's home in San Jose Nuevo to gather information for our Client's defense we were swiftly told that it is way too dangerous to send anything less than a battalion of soldiers for protection. Even the Federal police are unsafe in Michoacán; recent news stories report mass beheading of police officers. This is the drug-ridden, extremely violent place that Mr. Garcia-Zambrano grew up in. The dangers that plague the streets of Apatzingan dwarf that of even the most violent cities in the United States. It is not exaggerating to say that people fear for their life by just taking a step out the door of their home. The tragic conditions in which our Client was raised are unimaginable from the relative comfort and safety of Portland, Oregon.

Thus, a downward departure is requested, given the very unfortunate and deplorable nature of Mr. Garcia-Zambrano's upbringing.

**2. Lack of Guidance as a Youth**

A defendant who lacks guidance as a youth renders a defendant less culpable, and warrants a departure. See United States. v. Floyd, 945 F.2d 1096 (9th Cir. 1991) (in drug case, court affirms departure from guideline range of 30 years to life to 17 years because of defendant's abandonment by his parents and lack of guidance as a youth –rendering defendant less culpable).

When Mr. Garcia-Zambrano was a child, his father left the family home to go work in a bigger city. Later on, his father left Mexico and came to the United States. During the father's time in the United States, he was convicted of drug charges, spent some time in prison, and was deported back to Mexico. Although there may have been good intentions at the beginning, when Mr. Garcia-Zambrano's father left home, this obstructed the guidance that Mr. Garcia-Zambrano may have

**DEFENDANT'S SENTENCING MEMORANDUM**              **PAGE 5**

otherwise received. How to conduct one's self, provide for the family, and be a productive member of society, are all life lessons that we learn from our parents. While his mother still lived in the home, Mr. Garcia-Zambrano was deprived of a father for an important part of his formative years. Without both parents available to teach him what is and what is not acceptable in life, Mr. Garcia-Zambrano lacked guidance as a youth, in which a departure should be granted. Moreover, the example set by Mr. Garcia-Zambrano's father led directly to the criminal conduct at issue herein. Certainly, we would ask that the Court take cognizance of this most unfortunate circumstance.

### 3. The Defendant is Youthful and of Immature Age

Pursuant to section 5H1.1 of the Federal Sentencing Guidelines Manual, age may be relevant as to whether a downward departure is warranted. See Roper v. Simmons, 543 U.S. 551, 567-570 (2005) ("today our society views juveniles, in the words *Atkins* used respecting the mentally retarded, as 'categorically less culpable than the average criminal'.... '[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions'.... The susceptibility of juveniles to immature and irresponsible behavior means "their irresponsible conduct is not as morally reprehensible as that of an adult.... '[t]he relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside.'" ) (internal citations omitted); see also Johnson v. Texas, 509 U.S. 350, 367 (1993) ( jury may consider a 19-year-old defendant's youth as a mitigating factor because "youth is more than a chronological fact.  It is a time and condition of life when a person may be most susceptible to influence and psychological

**DEFENDANT'S SENTENCING MEMORANDUM**                    **PAGE 6**

damage."); <u>Miller v. Alabama</u>, 132 S.Ct. 2455, 2464 (2012) (citing <u>Graham v. Florida</u>, 130 S.Ct. 2011, 2026 (2010)) (Stating that youthful offenders are constitutionally different than older adults in that they have diminished culpability, more probability of reform, and are less deserving of the more severe punishments).

The differences between youthful and older offenders is not trivial. In recent times, the United States Supreme Court has highlighted the stark contrasts between younger and older people who commit crimes, and has concentrated on the lack of brain development in youthful offenders which warrant mitigation. The idea that young minds are not fully developed has prompted the Court to strike down the death penalty, mandatory life imprisonment without the possibility of parole, and life imprisonment without the possibility of parole for non-homicide offenses, even for the most heinous crimes committed by young offenders. See <u>Roper v. Simmons</u>, 543 U.S. 551 (2005); <u>Graham v. Florida</u>, 130 S.Ct. 2011 (2010); <u>Miller v. Alabama</u>, 132 S.Ct. 2455 (2012).

These recent decisions recognize that young offenders lack a maturity and have an underdeveloped sense of responsibility, are more vulnerable or susceptible to negative influences and outside pressures, and their characters are not as well formed. <u>Graham</u>, 130 S.Ct. at 2026 (citing <u>Roper</u>, 543 U.S. at 569-570). The <u>Graham</u> Court emphasized that developments in psychology and brain science continue to show fundamental differences between young and old offenders. The Court stated, for example, that parts of the brain involved in behavior control continue to mature through late adolescence. <u>Id.</u> (citing Brief for American Medical Association et al. as Amici Curiae 16-24; Brief for American Psychological Association et al. as Amici Curiae 22-27). This issue of behavior control, according to the Court, is no more apparent than in

**DEFENDANT'S SENTENCING MEMORANDUM**            **PAGE 7**

a youthful offender's ability to assist in their defense. A young person's difficulty in weighing long-term consequences, a corresponding impulsiveness, and a reluctance to trust defense counsel are all a part of the world seen by youthful offenders, and can significantly impair their defense. Id. at 2032. Relatedly, that impulsiveness and lack of understanding the consequences of actions are what lead many young offenders to offend in the first place. Id.

At the time of his sentencing, Mr. Garcia-Zambrano will be just 21 years old. While he is not a juvenile, it should be noted that he was one of the younger participants in this conspiracy. Mr. Garcia-Zambrano originally came to the United States to go to school. However, shortly after his arrival, Mr. Garcia-Zambrano's father was imprisoned on drug-related charges. Thus, in order to provide for his family, Mr. Garcia-Zambrano began to work, and did various jobs such as plant trees and clean homes. When Mr. Garcia-Zambrano met co-defendant Adrian Gonzales-Pasaye, he knew that he could make money by working for Adrian; much more money than he could otherwise make. Mr. Garcia-Zambrano yielded to temptation and followed his father's example, joining the conspiracy in order to make money.

Moreover, Mr. Garcia-Zambrano was at an impressionable age, and without his father around, he turned to other father-like figures, Adrian and Hugo Gonzales-Pasaye. Adrian Gonzales-Pasaye is 35 years old and Hugo Gonzales-Pasaye is 27 years old. At the time they first encounter Mr. Garcia-Zambrano, he was just 19 years old. By this time, Adrian and Hugo Gonzales-Pasaye had already been in America for some years, had connections, and knew how to survive in a foreign land. Mr. Garcia-Zambrano had come to the United States to go to school, and that plan fell through. When his father went to prison, Mr. Garcia-Zambrano had virtually nobody to turn to, but then he met Adrian Gonzales-Pasaye. With this meeting, it was as if

**DEFENDANT'S SENTENCING MEMORANDUM**          **PAGE 8**

Adrian Gonzales-Pasaye took Mr. Garcia-Zambrano under his wing, giving him small tasks and eventually giving him a little bit more responsibility. This is significant given Mr. Garcia-Zambrano's age and impressionability. Mr. Garcia-Zambrano's decision to enter the conspiracy can be viewed as a decision made by a youthful offender, who saw what material things other people had, and decided to give it a try himself.

We urge the Court to grant a downward departure to reflect the relative youth and immaturity demonstrated by Mr. Garcia-Zambrano in making the decision to join the conspiracy.

### 4. Role in the Offense Versus that of Co-Defendants

When there are multiple co-defendants, a defendant's role, versus that of co-defendants, can warrant a downward departure. U.S. v. Smart, 518 F.3d 800, 809-810 (10th Cir. 2008) (where defendant convicted after trial of inducing a minor to engage in sexually explicit conduct for the purpose of producing videotapes in violation of 18 U.S.C. 2251(a), and guidelines 168 to 210 months, sentence to 120 months affirmed because defendant less culpable than co-defendant who received 120 months); U.S. v. Jimenez-Gutierrez, 491 F.3d 923, 926, 929 (8th Cir. 2007) (where defendant pled guilty to conspiracy to distribute more than fifty grams of meth., and where guidelines 188 to 220 months, court's sentence of 96 months proper in part because court determined that guideline sentence was too harsh because guidelines did not account for fact that higher-ups in the conspiracy deserved much more time than defendant).

In this case, Mr. Garcia-Zambrano was charged in Federal Court along with eight other co-defendants. Others involved in this conspiracy were prosecuted in State Court. At the top of this organization were Hugo and Adrian Gonzales-Pasaye. At the time of this filing, some of the other members of conspiracy have been sentenced, some have not. Both Hugo and Adrian

**DEFENDANT'S SENTENCING MEMORANDUM**                    **PAGE 9**

Gonzales-Pasaye were sentenced to 135 months prison. Lino Silva-Mendoza was sentenced to one year and one day of prison, and Gregorio Gutierrez-Montes was sentenced to 36 months prison.

We are confident the government will concede that Mr. Garcia-Zambrano's role in the conspiracy was substantially less than that of Hugo and Adrian Gonzales-Pasaye. His role was also less than Gregorio Gutierrez-Montes, who worked as a distributor of methamphetamine. Lino Silva-Mendoza worked as a mechanic who made the "secret traps" on vehicles used for transportation of drugs.

Significantly, Gregorio Gutierrez-Montes received a mere 36 months of prison for his role in the conspiracy. Gutierrez-Montes was a distributor, and was also caught transporting several pounds of methamphetamine from California to Oregon. Gutierrez-Montes was responsible for selling dangerous narcotics for his own profit, and for the profit of the leaders, Hugo and Adrian Gonzales-Pasaye. Compared to Mr. Garcia-Zambrano, Gutierrez-Montes was much more culpable. Mr. Garcia-Zambrano never sold drugs independently or made his own profit from sales. He was paid whatever the leaders decided to give him. Mr. Garcia-Zambrano was subservient to the leaders in regard to the tasks he completed. He did what he was told. On the other hand, Gutierrez-Montes, as a seller, had freedom to choose where, when, and to who he sold, and he did so for profit.  Mr. Garcia-Zambrano, as a humble underling, should not face more severe punishment than Gutierrez-Montes, who profited personally as a result of his criminal activities.

Mr. Garcia-Zambrano's role was to be a driver for Adrian Gonzales-Pasaye, and he occasionally delivered drugs to distributors. Mr. Garcia-Zambrano would also wire money to

**DEFENDANT'S SENTENCING MEMORANDUM**                    **PAGE 10**

Mexico, and he did some other small jobs such as wash cars and do clean-up tasks. Defense

Counsel believes Mr. Garcia-Zambrano was a member of the conspiracy for much less time than

other participants. Mr. Garcia-Zambrano was not a leader or organizer like Adrian or Hugo

Gonzales-Pasaye; he simply did what he was told. He was essentially a gopher, an errand boy; he

was not a major player. If Mr. Garcia-Zambrano had left the conspiracy, the organization would

not have missed a beat. We urge that his sentence should accurately reflect his minor role in the

conspiracy. While his role was not minimal, his role was substantially less than the leaders, and

his sentence should accordingly be substantially less than the 135 month sentence given to the

leaders. Given Mr. Garcia-Zambrano's minor role in the conspiracy, the Defense urges that a 2-

level downward departure should apply per section 3B1.2(b) of the Federal Sentencing

Guidelines, as he is less culpable than most of the other participants.

## 5. The Drug Guidelines Over-Punish a Person in Defendant's Position

The United States Supreme Court has held that the drug guidelines in particular lack an

empirical basis, and as such, those guidelines are entitled to less respect. Gall v. United States,

552 U.S. 38, 46 n.2 (2007); Kimbrough v. United States, 552 U.S. 85, 109 (2007); United States

v. Thomas, 595 F.Supp.2d 949, 952 (E.D. Wis. 2009) (substantial departure allowed based on

lack of empirical approach to forming the drug guidelines.). The drug guidelines rely very

heavily on the quantity of drugs rather than a defendant's role in the offense, which has been

grounds for a departure. See Thomas, 595 F.Supp.2d at 952; United States v. Dossie, No.

11-CR-237 at 4 (E.D. N.Y. March 30, 2012) ("Drug quantity is a poor proxy for culpability

generally and for a defendant's role in a drug business in particular.").

In this case, Mr. Garcia-Zambrano, as a member of a drug-trafficking organization, is

**DEFENDANT'S SENTENCING MEMORANDUM**                    **PAGE 11**

being held responsible for the quantity of drugs that everyone else is–1.5 kilograms or more of methamphetamine (actual). The guidelines prescribe an offense level 38 for 1.5 kilograms or more of methamphetamine (actual), or 15 kilograms or more of methamphetamine. Essentially, the guidelines are punishing offenders based on the amount of the controlled substance found in the substance seized. Thus, it takes 10 times the amount of a diluted batch of methamphetamine to get the same punishment as a small amount of purer methamphetamine. This is a similar discrepancy as the punishments for powder and "crack" cocaine exhibit.

The problem here is that the guidelines punish based not on an empirical approach, but rather based on quantity and potency of a controlled substance. While that may be a reasonable way to punish offenders in some cases, it is not reasonable as to Mr. Garcia-Zambrano. We urge that Mr. Garcia-Zambrano's punishment should reflect his role in the offense. Mr. Garcia-Zambrano was not routinely manufacturing, possessing, or delivering methamphetamine. He occasionally brought small amounts of product to distributors, as he was told to do by higher-ups. He did not sell methamphetamine for his own profit. His tasks were often menial, and those that would befit a personal assistant to someone of higher power and authority. In that the guidelines seek to punish Mr. Garcia-Zambrano based on the quantity of drugs seized, and not based on his role in the organization, the Defense urges a downward departure to accurately reflect Mr. Garcia-Zambrano's culpability.

### 6. A Sentence that is too Long will Promote Recidivism, Impair Rehabilitation, and make a Non-Violent Offender a Greater Danger to Society

An unenlightened theory of crime and punishment would instruct that, if a little punishment is good, substantially more punishment is better.  Such a philosophy is emphatically

**DEFENDANT'S SENTENCING MEMORANDUM**                    **PAGE 12**

<u>not</u> the policy that is required by 18 U.S.C. § 3553(a), wherein Congress mandated that a sentence must be "sufficient, but not greater than necessary."  Piling on of punishments greater than necessary would be akin to a heart patient doubling his cardiac medication based on the ill-founded belief that more is necessarily better.

　　A lengthy prison sentence promotes recidivism, impairs rehabilitation, and turns a non-violent offender into a danger to society. <u>U.S. v. Bannister</u>,  786 F.Supp.2d 617 (E.D. N.Y. 2011) ("Recidivism may be promoted by the behavior traits prisoners develop while incarcerated. To survive, they 'tend to develop characteristics institutionally selected for survival: circumspection, canniness, coldness, and cruelty.'" <u>Id.</u> at 659 (quoting Robert Perkinson, Texas Tough: The Rise of America's Prison Empire 368 (Picador 2010) (2009)); Testimony of Pat Nolan, Vice President of Prison Fellowship The Joint Economic Committee of the U.S. Congress "Mass Incarceration in the United States: At What Cost?" (October 4, 2007), *available at* http://sentencing.typepad.com/sentencing_law_and_policy/2007/10/more-on-the-jec.html ("most inmates do not leave prison transformed into law-abiding citizens. In fact, the very skills inmates develop to survive inside prison make them anti-social when they are released..."); <u>See</u> Craig Haney & Philip Zimbardo*, The Past and Future of U.S. Prison Policy: Twenty-five Years After the Stanford Prison Experiment*, AMERICAN PSYCHOLOGIST, July, 1998, at 721 ("Department of corrections data show that about a fourth of those initially imprisoned for nonviolent crimes are sentenced for a second time for committing a violent offense. Whatever else it reflects, this pattern highlights the possibility that prison serves to transmit violent habits and values rather than to reduce them."); <u>U.S. v. Collington</u>,  461 F.3d 805, 809 (6th Cir. 2006) (in drugs and gun case where guidelines call for 188 to 235 months, sentence of 120 months affirmed in part

**DEFENDANT'S SENTENCING MEMORANDUM**　　　　　　　**PAGE 13**

because "a 120 month sentence  is sufficient enough to reflect the crimes committed while allowing for the possibility that Collington  may reform and after his release from prison, when he is in his mid-thirties, may go on to a productive life in society.").

Mr. Garcia-Zambrano is only 21 years old. He will likely get out of prison towards the age of 30. He will still be a relatively young man when he is released. Incarcerating Mr. Garcia-Zambrano for nearly a decade, for a non-violent offense, may cause him to develop the skill set that will later place him back in prison, whether that be in Mexico or the United States. Formulating traits that help one survive in prison is what may keep that person on the path to offending again. Further, given that Mr. Garcia-Zambrano is below-average in size, he will need to develop a toughness and psyche that will make him less desirable once out of prison. Mr. Garcia-Zambrano is not currently a hardened criminal. If he is given a lengthy prison sentence, he may well become one. Given his age, the nature of his upbringing, and the circumstances of the instant offense, Mr. Garcia-Zambrano is in a vulnerable position in life, and the amount of time he spends in prison for this offense may very well determine his life's path.

With that in mind, a downward departure is warranted to keep a youthful non-violent offender from becoming a career criminal.

### 7. Mr. Garcia-Zambrano is an Alien Facing more Severe Prison Conditions than Non-Aliens

A departure may be warranted based on the fact that aliens face more severe conditions in prison than non-aliens. See United States  v. Farouil, 124 F.3d 838, 847 (7th Cir. 1997) (where defendant charged with importing heroin, district court may consider whether defendant's status as a deportable alien would result in unusual or exceptional hardship in conditions of

**DEFENDANT'S SENTENCING MEMORANDUM**                    **PAGE 14**

confinement that might warrant a departure (ineligible for home detention, community confinement, work release, intermittent incarceration, or minimum security designation)).

Mr. Garcia-Zambrano is an alien who will be deported back to Mexico following his incarceration in the United States. His status as an alien makes his confinement particularly harsh because he does not qualify for certain alternative sentences or conditions of sentencing. For instance, Mr. Garcia-Zambrano is not eligible for home confinement or work release because of his alien status. As such, a departure is warranted to reflect the harshness of his incarceration and lack of opportunities for Mr. Garcia-Zambrano as an alien, as opposed to non-aliens.

**8. Mr. Garcia-Zambrano will be Punished Severely by Virtue of Deportation**

Deportation is recognized as a very severe punishment and is grounds for a departure. See Padilla v. Kentucky, 130 S.Ct. 1473, 1481, 1486 (2010) (deportation as the result of a conviction is "a particularly severe penalty" and is the "equivalent to "banishment or exile"); Jordan v. De George, 341 U.S. 223, 232 (1951) (Jackson, J., dissenting) (deportation is "a life sentence of banishment in addition to the punishment which a citizen would suffer from the identical acts."); U.S. v. Biheiri, 356 F.Supp.2d 589,603 (E.D. Va. 2005) (Where Egyptian defendant was convicted of financing terrorism, judge imposed a sentence of thirteen months and one day (far less than advisory guideline) reasoning in part that "Because Biheiri will be deported to Egypt immediately following his release from confinement, the goals of protecting the public and providing rehabilitative opportunities are of little import in the instant circumstances. And, while it may appear that a longer sentence is appropriate given Biheiri's involvement in terrorist financing, the principle that a defendant should only be punished for the offenses of conviction as provided by law commands that this involvement should not drive the sentence.").

**DEFENDANT'S SENTENCING MEMORANDUM**                                    **PAGE 15**

Mr. Garcia-Zambrano will be deported as soon as he is released from prison. He will never legally be allowed to return to the United States. While trafficking narcotics is a very serious crime, it must not be forgotten that Mr. Garcia-Zambrano will not be walking the streets of Portland, or anywhere else in the United States, following his incarceration. He will be sent back to his homeland. Deportation has been recognized by the United States Supreme Court as a "particularly severe penalty," which should be considered in determining the appropriate amount of prison time for Mr. Garcia-Zambrano.

Moreover, because Mr. Garcia-Zambrano will be deported after his incarceration, the cost of imprisoning a deportable alien should be taken into account in determining a prison sentence. In this case, if this Court accepts the Probation Department's recommendation, Mr. Garcia-Zambrano will face 108 months of prison time. Multiply 108 months by 85% (as prisoners get 15% off their sentence for good behavior) and you get 91.8 months, or 7.65 years. The average yearly cost to imprison a single inmate is approximately $26,500. FEDERAL BUREAU OF PRISONS, FEDERAL PRISON SYSTEM PER CAPITA COSTS FY 2012 (2012). Multiply that number by 7.65 years, and the cost of imprisoning Mr. Garcia-Zambrano will exceed $200,000. We would submit that far more effective uses can be found for such a vast sum.

This very substantial cost to keep Mr. Garcia-Zambrano in prison, and the fact that he will be deported following his sentence, merits consideration in determining an appropriate sentence, and Mr. Garcia-Zambrano urges that a departure is warranted.

**9. Mercy**

Lastly, Counsel for Mr. Garcia-Zambrano seeks the mercy of this Court. American sentences have been characterized as particularly long, harsh, and lack an individualistic

**DEFENDANT'S SENTENCING MEMORANDUM                    PAGE 16**

character to them; causing sentences to treat offenders as less than human beings. These were the sentiments of United States Supreme Court Justice Anthony Kennedy as recently as 2007, when he expressed these feelings to the United States Senate Judiciary Committee.

Mr. Garcia-Zambrano has accepted responsibility for his involvement in the criminal enterprise. Taking into account Mr. Garcia-Zambrano's age, immigration status, nature of his involvement, and the punishments meted out to others involved in this conspiracy, a sentence substantially below that of the advisory sentence is warranted. Given the stiff penalties that come from the Guideline sentence, Mr. Garcia-Zambrano seeks the mercy of this Court.

F. CONCLUSION

The advisory Sentencing Guidelines subject Mr. Garcia-Zambrano to a sentence of 108 to 135 months, with the government's recommendation at 108 months.  However, when one considers the policies enacted as part of 18 U.S.C. § 3553(a), there are grounds to impose a sentence substantially lower than that very harsh range. We urge the Court to impose a sentence considerably lower than the sentence which is being sought by the government.

DATED:      Portland, Oregon
            February 20, 2013


            s/d Mark C. Cogan
            MARK C. COGAN, OSB# 92016


**DEFENDANT'S SENTENCING MEMORANDUM**                    **PAGE 17**